******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DIANA THEODORE, ADMINISTRATRIX (ESTATE OF CATHERINE NUCKOLS) *v.* LIFELINE SYSTEMS COMPANY ET AL.
(AC 37857)

Keller, Prescott and Harper, Js.

*Argued January 17—officially released May 23, 2017*

(Appeal from Superior Court, judicial district of Hartford, Elgo, J.[motions for directed verdict and to set aside verdict; judgment].)

*Maria K. Tougas*, for the appellant (plaintiff).

*Trevor J. Keenan*, for the appellee (named defendant).

*Sharon Baldwin*, for the appellee (defendant VNA Healthcare, Inc.).

*Opinion*

KELLER, J. The plaintiff, Diana Theodore, the administratrix of the estate of Catherine Nuckols, commenced the present action sounding in negligence, breach of contract, and products liability against the defendants, Lifeline Systems Company (Lifeline) and VNA Healthcare, Inc. (VNA).[1] The plaintiff appeals from the judgment of the trial court rendered in favor of the defendants after it granted motions for a directed verdict brought by the defendants. Also, the plaintiff appeals from the court's denial of her motion to set aside the verdict. The plaintiff claims that (1) in ruling on the motions for a directed verdict, the court erroneously concluded that she failed to present evidence sufficient to satisfy the essential element of causation,[2] and (2) the court erroneously precluded certain evidence. We affirm the judgment of the trial court.

Relevant to all three counts of the underlying complaint are the plaintiff's allegations that, in 2010, the plaintiff's decedent, Catherine Nuckols, executed service agreements with VNA, a company that was in the business of providing independent living services to residents of the Greater Hartford area. By these agreements, the decedent subscribed to receive home medical alert system services through Lifeline for a monthly fee. Thereafter, VNA installed a Lifeline 6800XT medical alert system at the decedent's Glastonbury residence. The system consisted of a communicator device and a personal help button that was designed to be worn by the user. The communicator device was connected to the decedent's living room telephone by a piece of equipment described as "a splitter." When the system is functioning properly, and either the personal help button worn by the user or a help button located on the communicator device is pressed, a signal is transmitted, by means of the user's telephone equipment, to Lifeline's call center. This signal alerts Lifeline's call center that an emergency situation may have arisen at the decedent's residence. Further, the plaintiff alleged that, on July 29, 2011, the eighty-eight year old decedent, who lived alone, and cared for and maintained herself, was found to be deceased on the floor of her residence after having attempted to summon help by means of her Lifeline system.

In count one, brought against VNA, the plaintiff alleged that VNA was negligent in its installation of the Lifeline system. The plaintiff alleged that VNA failed to properly install the communicator device so that, when a help button was pressed, the system would seize the decedent's telephone line, thereby permitting an emergency signal to be transmitted from the decedent's residence to Lifeline's call center in circumstances in which one or both of the decedent's two telephones was either in use or simply off the hook. The plaintiff alleged that the user manual provided to the decedent by VNA "con-

tained various incorrect and contradictory statements pertaining to the inability of the device to 'seize the phone line' when the customer's phone was in use or off the hook . . . ." Additionally, the plaintiff alleged that VNA failed to install a special telephone jack (specifically, an RJ31X telephone jack) that would have enabled the communicator device to seize the telephone line to transmit an emergency signal; VNA failed to follow warnings and procedures related to the installation of the system; VNA's installer lacked necessary training, knowledge, and expertise with respect to the Lifeline system; and VNA failed to advise the decedent of "the purpose of the . . . [special] phone jack and the hazards and dangers of not having the recommended jack installed, and failed to ensure that [the decedent's] device would work when either [of the decedent's telephones were] in use or off the hook."

Further, the plaintiff alleged: "On or before July 29, 2011, one or more of the decedent's telephones was off the hook and she fell in her home and could not get up off the floor. On said date and at all times material thereto, the decedent exercised due care and she initiated a signal to the call center by pressing the 'help' button on the communicator and/or the [personal help button] necklace, however the Lifeline device failed to send the signal and/or 'dial in' to the call center, no [emergency] assistance was ever sent [to the decedent's residence], and the decedent remained on the floor for approximately [twenty-four to forty-eight] hours and eventually died on the floor of her residence."

The plaintiff alleged that, as a result of VNA's negligence, "the decedent remained on the floor for an undetermined amount of time, without medical attention, food or water, was unable to move or secure help and died a frightening death. . . . [T]he decedent suffered anguish, fear, and the realization that her helplessness and incapacity caused the impending end of her life and the experience of a lonely death. . . . [T]he decedent's ability to carry out life's activities was permanently destroyed . . . [and] funeral, burial, and other expenses and probate costs were incurred on behalf of the decedent and will continue to be incurred in the future."

In count two, brought against VNA, the plaintiff alleged that VNA breached its written agreements (both a "Service Agreement" and a "Care Plan Agreement") by which VNA agreed "that emergency medical assistance would be provided or [the decedent's] responders would be contacted in the event that the decedent activated the 'help' button on either the side of the Lifeline communicator or the [personal help button] necklace." The plaintiff, relying on prior allegations in the complaint, also alleged that "VNA breached its agreements with the decedent in that [after she initiated an emergency signal] no emergency medical assistance was

provided and no responders were contacted to advise of the emergency which befell the decedent.'' The plaintiff alleged that, as a result of Lifeline's defective product, the decedent suffered the consequences that previously were alleged in count one.

In count three, the final count of the complaint, the plaintiff set forth a cause of action against Lifeline sounding in products liability. The plaintiff, also relying on prior allegations in the complaint, alleged that, in twenty-two different ways, Lifeline acted negligently and carelessly when it put the Lifeline system into the stream of commerce, and that the system was expected to and did reach the decedent as a foreseeable user, without substantial changes in the condition in which it was sold. The plaintiff alleged that, under General Statutes § 52-575m, Lifeline was liable and legally responsible to the plaintiff for the damages caused by the system. As she did in the context of claim two, the plaintiff alleged that, as a result of the breach, the decedent suffered the consequences that previously were alleged in count one.

VNA denied that it acted negligently or that it breached its contract with the decedent. As a special defense, VNA alleged that ''[i]f, as alleged by the plaintiff, the decedent's injuries were caused by negligence and/or carelessness . . . it was more likely [caused by] the decedent's negligence . . . .'' The plaintiff denied the allegations in the special defense. Lifeline denied that it was liable under a theory of products liability for any damages. Both defendants denied the plaintiff's allegations, as set forth in all three counts of the complaint, with respect to the damages allegedly caused by them.

Thereafter, over the course of several days, the plaintiff presented evidence to a jury. The plaintiff, who is the decedent's sister, presented her own testimony, as well as testimony from Peter Galetsa, the plaintiff's husband; Carlos Morales, a former VNA employee who had installed the decedent's Lifeline system; Robin Timmer, a police officer with the Glastonbury Police Department who, following a request for a welfare check, had entered the decedent's residence and discovered the deceased therein; Joy Balsamo, a former Lifeline senior territory manager whose duties included selling and marketing the Lifeline system to VNA; Mary Jo Lucia, a former VNA referral intake coordinator who was involved with scheduling the installation of the decedent's Lifeline system; Mary Ann Dunbar, a former VNA business manager who oversaw the Lifeline program on behalf of the VNA; Dawn Gaylord Medina, a former Lifeline coordinator whose duties included training Lifeline system installers and coordinating the installation of Lifeline systems; Michael Tracey, a Lifeline senior manager of monitoring services whose duties encompass responding to signals from subscrib-

ers' communicator devices; Eva Baranowski, a VNA client services manager who formerly supervised VNA's homemaking department; Ellen Wilson, an advanced emergency medical technician (EMT) employed by the Glastonbury Ambulance Department, who was one of the first responders at the decedent's residence on July 29, 2011; Joseph Randolph, the owner of Randolph Telecom, Inc., which provides consulting services to designers of telecommunications equipment; and Roy Zagieboylo, the decedent's primary care physician. Additionally, the plaintiff presented a great deal of documentary evidence in support of her case, including excerpts of the deposition testimony of Martin Fox, an engineer, and William MacIver, an engineer employed by Lifeline.

In relevant part, the plaintiff presented evidence that after she was unable to contact the decedent by telephone, she and her husband, Galetsa, went to the decedent's residence but still were unable to contact the decedent. The plaintiff and Galetsa went to the Glastonbury Police Department and asked for assistance. Timmer forcibly entered the residence, where he found the decedent's body, face down, in a hallway near a bathroom. The decedent was wearing a personal help button, and a red light was flashing on the Lifeline communicator device, which occurs after a help button had been pressed. Telephone records submitted in evidence supported a finding that the decedent's telephone was off the hook for a lengthy period prior to the discovery of the decedent's body. Wilson testified that she observed bloody stool in a toilet near the decedent's body and that she believed the bloody stool to be consistent with gastrointestinal bleeding (GI bleed). The plaintiff rested her case-in-chief on March 18, 2015.

After the plaintiff rested her case, the defendants orally moved for a directed verdict. In their argument, the defendants focused on what they viewed as a lack of evidence to support a necessary finding by the jury with respect to the issue of causation of the damages claimed. The court invited the parties to present memoranda with respect to the motions for a directed verdict. Lifeline and VNA presented memoranda of law in support of the motions and the plaintiff presented a memorandum in opposition to the motions.

On March 24, 2015, during the defendants' case-in-chief, the court, by means of an oral ruling, granted the defendants' motions for a directed verdict.[3] In relevant part, the court explained that causation consisted of two components, cause in fact and proximate cause. The court explained that the test for cause in fact "is simply would the injury have occurred were it not for the actor's conduct." The court explained that the test for proximate cause "is determined by looking from the injury to the negligent act complained of [to determine whether] the . . . conduct is a substantial factor is

bringing about the plaintiff's injuries." The court observed that in undertaking its analysis, it must view the evidence in the light most favorable to the plaintiff, and that causation "must be based upon more than conjecture and surmise."

The court then stated: "This court finds that the plaintiff has failed to present evidence in the absence of speculation and conjecture to support causation; specifically, the plaintiff needed to establish that had the decedent pressed the Lifeline help button, and [if the emergency signal] had been successfully received, she would have received medical attention and lived.

"Dr. Zagieboylo was able to testify within a reasonable degree of medical probability that the decedent suffered a GI bleed and that it was a substantial factor in contributing to her death.

"He also testified that he would not expect her to die instantaneously from a GI bleed because he also testified that . . . he could not testify that the GI bleed caused her death or was the sole cause of death.

"Dr. Zagieboylo's opinion on its own is wholly inadequate to establish causation. Because, as the court will elaborate further, Dr. Zagieboylo made clear that he could not so opine.

"He also testified that it was likely that she had symptoms [related to the GI bleed], but his critical testimony which he clearly and candidly couched in terms of possibilities was the following . . . if [the decedent] became symptomatic and . . . whether she became symptomatic, he could not say if she experienced symptoms, interpreted them correctly, and or acted on her symptoms.

"When asked whether . . . the absence of medical attention, food, and water . . . was a substantial factor in contributing to the death, [Dr. Zagieboylo] testified that [that question] 'was hard because time was a factor,' and that . . . '[m]aybe Life Star wouldn't have saved her' . . . and he also stated . . . '[t]here may have been time to save her.'

"More definitively to the question of cause of death, Dr. Zagieboylo made crystal clear the distinction in his opinion between the GI bleed being a contributing factor in her death, [about] which he could testify within a reasonable degree of medical probability, versus the actual cause of death, about which he clearly and candidly testified that he could not opine within a reasonable degree of medical probability.

"He clearly testified that he could not testify that the GI bleed was a sole cause of death and made clear that [the decedent] could have died from any number of causes of which the GI bleed was a contributing factor, including cerebral vascular disease, heart attack, or stroke. He noted that [the decedent] could have had a

cardiovascular collapse without [having experienced] symptoms [beforehand].

"Finally, Dr. Zagieboylo testified as to the question of whether or not he could opine with a reasonable degree of medical probability that had [the decedent] activated her Lifeline device, she would have lived. His response was a most candid and definitive, 'oh, no.'

"He testified that the GI bleed contributed to her death but that he couldn't say what actually caused her death and [that] '[t]hat would be even more speculative.'

"When asked . . . would she have lived if the call had gone through, he could not say with a reasonable [degree of] medical probability and, then again, stated, 'that would be speculation because it was based on so many maybes.'

"The court finds that Dr. Zagieboylo's unshakeable opinion regarding the speculative nature of [the decedent's] actual cause of death, based on the facts before him, and how he could not opine whether she would have lived, had the call [to Lifeline] gone through, is fatal to the plaintiff's case. . . .

"Although the elements of a cause of action may be established on the basis of inferences drawn from circumstantial evidence, such inferences must be reasonable and logical and the conclusions based on them must not be the result of speculation and conjecture.

"An inference must have some definite basis [in] the facts. When an element necessary to a cause of action cannot be established without conjecture, the evidence presented cannot withstand a motion for directed verdict."

The court directed a verdict "for the defendants in this case," and later rendered judgment in favor of the defendants.[4] Thereafter, the court summoned and discharged the jury. The plaintiff filed a motion to set aside the verdict rendered in the defendants' favor. The court denied this motion. Additional facts will be discussed as necessary.

I

First, the plaintiff claims that, in ruling on the motions for a directed verdict, the court erroneously concluded that she failed to present evidence sufficient to satisfy the essential element of causation. We disagree.

With respect to her cause of action against Lifeline, the plaintiff claims that the court's ruling on the motion for a directed verdict was improper because she presented sufficient evidence to demonstrate that "as a result of the Lifeline device being unreasonably dangerous and malfunctioning because it lacked line seizure capability, [the decedent] suffered harm and an untimely, wrongful death." The plaintiff devotes a great deal of her arguments before this court to the issue of

whether the evidence demonstrated that the Lifeline system was defective in its design and installation. Extensive proof that the decedent's Lifeline system was defective, however, is no substitute for proof that the defective product caused the decedent to endure suffering or death. As our Supreme Court has observed, "[n]o matter how negligent a party may have been, if his negligent act bears no [demonstrable] relation to the injury [alleged], it is not actionable." (Internal quotation marks omitted.) *Stuart* v. *Freiberg*, 316 Conn. 809, 833–34, 116 A.3d 1195 (2015). The court's focus in granting the motions for a directed verdict was on whether the plaintiff presented evidence that any or all of the alleged defects inherent in the system, which allegedly rendered it unable to seize the decedent's telephone line to transmit an emergency signal, actually caused the injuries and damages alleged in the complaint.

In challenging the court's rationale, the plaintiff mostly draws our attention to the testimony of Wilson and Zagieboylo. She states: "Wilson testified that it was highly probable that [the decedent] had suffered from an imminent and significant GI bleed, and collapsed on the way out of the bathroom and could not get up off the floor by herself. . . . The GI bleed was the missing piece of the puzzle and the reason the jury could determine that [the decedent] had activated her Lifeline device in order to summon emergency assistance from . . . Lifeline. If [the Lifeline emergency response center] had answered, she would have had medical assistance sent immediately. . . .

"Wilson testified at trial that she had handled several ambulance calls for patients who suffered similar GI bleeds and that she routinely successfully treated them either at the scene or on the way to the hospital. . . . She testified that she also successfully revives patients when they have stopped breathing. . . . The Ambulance Report she prepared confirmed that it took [Wilson's] EMT team three minutes from the time of their dispatch to the time of their arrival to [the decedent's] apartment on July 29, 2011. . . . Therefore, based on Wilson's testimony and report, if the ambulance had been dispatched by Lifeline when [the decedent] activated her help button, reasonable jurors could determine, or at least reasonably infer, that it was more probable than not that EMTs would have arrived [three] minutes after [the decedent's] activation, and in so doing, decrease the harm [the decedent] suffered past that [three] minute mark."

Focusing on Zagieboylo's testimony, the plaintiff argues: "Zagieboylo's medical diagnosis of a GI bleed matched Wilson's medical assessment of a GI bleed at the scene. Dr. Zagieboylo went a step further and opined, within a reasonable degree of medical probability, that [the decedent] suffered a GI bleed which was a substantial cause of her death. He also opined with

a reasonable degree of medical certainty that the symptoms associated with a GI bleed can go on for several hours and that the majority of patients that suffer from GI bleeds do not die within minutes, and often do not die at all, because GI bleeds are treatable by the quick administration of intravenous fluids. This testimony confirmed Wilson's testimony that she has successfully treated patients with GI bleeds similar to [that experienced by the decedent]. . . . Dr. Zagieboylo opined with a reasonable degree of medical certainty that [the decedent] did not die within a matter of minutes from the GI bleed.

"The combined testimony of . . . Wilson and Dr. Zagieboylo provided a plethora of medical information in order to 'connect the dots' on causation. . . . Wilson and Dr. Zagieboylo established the probability that while [the decedent] had suffered a GI bleed and the GI bleed was a substantial cause of her death, with proper treatment, she would not have died in a few minutes, thereby enabling the jury to make a reasonable and logical inference that [the decedent] would have lived for at least that three minutes that it took for the Glastonbury ambulance to get to her apartment, as long as the Lifeline device had worked properly and Lifeline fulfilled its duty to dispatch an ambulance in the first instance. Thus, [the] plaintiff established the unbroken sequence of events which tied the [decedent's] injuries to [Lifeline's] conduct. . . . This unbroken sequence begins with a defective Lifeline device that malfunctioned because it failed to respond to [the decedent's] emergency help call, which she activated because she was suffering from a GI bleed, and ends with [the decedent] lying on the floor suffering from a treatable condition that went completely untreated because of the defendant Lifeline." (Emphasis omitted.)

Referring to her products liability cause of action against Lifeline and her negligence cause of action against VNA, the plaintiff claims that the court "erred in determining that [she] failed to present sufficient direct and circumstantial evidence of proximate cause in a product defect/negligence case." The plaintiff argues that "[i]n order to establish causation under both the [Products Liability Act, General Statutes § 52-572m et seq.], and ordinary negligence, sufficient to have the case go to the jury, all [the] plaintiff has to show is that the defendants' negligent conduct was a substantial factor in bringing about the [decedent's] foreseeable injury in light of all relevant circumstances." (Emphasis omitted.) The plaintiff argues that, for a variety of reasons, the evidence demonstrated that the claimed injuries to the decedent were foreseeable to Lifeline and VNA, and that the jury, in its fact finding role, could so find.[5]

We begin our analysis of the claim by setting forth our familiar standard of review and some governing

legal principles. "The defendant must overcome a high threshold to prevail on . . . a motion for a directed verdict . . . . Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party. . . . Put differently, [i]f the evidence in a case presents such a situation that the minds of fair and reasonable men could therefrom reach but one conclusion, there is no question for a jury. . . . But if the evidence is such that honest and reasonable men could fairly differ and reach different conclusions, the issues should go to the jury for determination." (Citation omitted; internal quotation marks omitted.) *Rawls* v. *Progressive Northern Ins. Co.*, 310 Conn. 768, 775–76, 83 A.3d 576 (2014); see also *Hicks* v. *State*, 287 Conn. 421, 432, 948 A.2d 982 (2008).

"Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Citation omitted; internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 855–56, 37 A.3d 700 (2012); see also *Schweiger* v. *Amica Mutual Ins. Co.*, 110 Conn. App. 736, 739, 955 A.2d 1241 (to establish prima facie case, proponent must submit evidence that is sufficient to establish fact or facts it is adduced to prove), cert. denied, 289 Conn. 955, 961 A.2d 421 (2008).

With respect to the products liability cause of action brought against Lifeline and the negligence cause of action brought against VNA, we briefly review what was required for the plaintiff to establish a prima facie case sufficient to survive the defendants' motions for a directed verdict, paying particular attention to the essential element of causation in both causes of action.

Our Supreme Court has described the essential elements of a strict products liability claim as follows: "(1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition

unreasonably dangerous to the consumer or user; (3) *the defect caused the injury for which compensation was sought*; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in the condition." (Emphasis added.) *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 234, 429 A.2d 486 (1980).

"Proof that a defect in the product caused the injury in controversy is a prerequisite to recovery for product-caused injury in every products liability case, whether the action is grounded on negligence, breach of warranty, strict liability in tort, fraud and deceit or misrepresentation, principles of admiralty, or a combination of such theories. . . .

"The causation inquiry has two facets: (1) cause-in-fact; and (2) legal or proximate cause. These two components ask the following questions respectively: (1) whether the defendant's conduct was the cause-in-fact of the injury; and, if so; (2) whether as a matter of social policy the defendant should be held legally responsible for the injury. Proof of proximate cause requires proof of both cause-in-fact and legal cause." (Footnotes omitted.) 63 Am. Jur. 2d 55–58, Products Liability § 21 (2010). "Cause-in-fact, also referred to as actual cause, asks whether there was a sufficiently close, actual, causal connection between the defendant's conduct and the actual damage suffered by the plaintiff. It requires that there be a direct causal connection between the negligence or product defect and the injury. That is, it refers to the physical connection between an act and an injury." (Footnotes omitted.) 63 Am. Jur. 2d, supra, § 24, p. 60.

"A cause of action in negligence is comprised of four elements: duty; breach of that duty; *causation*; and actual injury." (Emphasis added.) *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 328, 107 A.3d 381 (2015). "Legal cause is a hybrid construct, the result of balancing philosophic, pragmatic and moral approaches to causation." *Kowal* v. *Hofher*, 181 Conn. 355, 359, 436 A.2d 1 (1980).

"The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. . . . The second component of legal cause is proximate cause . . . . [T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. . . . Further, it is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendants' conduct]. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. . . . This causal connection must be based upon more than

conjecture and surmise. . . . An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm. . . . The finding of actual cause is thus a requisite for any finding of proximate cause." (Citation omitted; internal quotation marks omitted.) *Winn* v. *Posades*, 281 Conn. 50, 56–57, 913 A.2d 407 (2007). "Because actual causation, in theory, is virtually limitless, the legal construct of proximate cause serves to establish how far down the causal continuum tortfeasors will be held liable for the consequences of their actions." *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, 247 Conn. 597, 604, 724 A.2d 497 (1999).

At this juncture in our analysis, we observe that, if the plaintiff failed to present evidence that, if credited by the jury, demonstrated that defects in Lifeline's system and VNA's negligent actions were causes in fact of the injuries for which compensation was sought, she failed to establish a prima facie case. The complaint sought damages for the decedent's death. Additionally, the complaint reasonably could be construed to seek damages for the amount of time, if any, that the decedent endured while on the floor of her residence and waiting for help to arrive prior to her death. The plaintiff alleged, in part, that "the decedent remained on the floor for an undetermined amount of time, without medical attention, food or water, was unable to move or secure help and died a frightening death" and that "the decedent suffered anguish, fear, and the realization that her helplessness and incapacity caused the impending end of her life and the experience of a lonely death." "Actual cause requires evidence that the plaintiff's injury would not have occurred in the precise way that it did without the defendant's conduct." *Shegog* v. *Zabrecky*, 36 Conn. App. 737, 745, 654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995). In light of the allegations in the present case, it was the plaintiff's burden to demonstrate that the decedent utilized the Lifeline system to summon assistance and that, absent the tortious conduct of the defendants, emergency assistance would have spared her from any amount of suffering after she activated her Lifeline system or would have saved her life.

The allegations, therefore, required the plaintiff to present evidence with respect to the cause of the decedent's death. This was a contested issue that required expert testimony.[6] "When the causation issue involved goes beyond the field of ordinary knowledge and experience of judges and jurors, expert testimony is required." *Green* v. *Ensign–Bickford Co.*, 25 Conn. App. 479, 488, 595 A.2d 1383, cert. denied, 220 Conn. 919, 597 A.2d 341 (1991). "An exception to the general rule with regard to expert medical opinion evidence is when the medical condition is obvious or common in everyday life. . . . Similarly, expert opinion may not be necessary as to causation of an injury or illness if the plaintiff's evidence

creates a probability so strong that a lay jury can form a reasonable belief." (Citations omitted; internal quotation marks omitted.) *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 89, 828 A.2d 1260 (2003); see also *Poulin* v. *Yasner*, 64 Conn. App. 730, 738, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001).

Before reviewing the evidence relevant to our analysis, we address the plaintiff's argument that, in its decision, the trial court "failed to recognize the applicability of the tort doctrine known as 'the affirmative duty to respond,' which was clearly breached by both defendants in this case . . . ." In her principal appellate brief, the plaintiff argues that under this theory of liability, set forth in 2 Restatement (Second), Torts § 323, p.135 (1965),[7] she did not bear the burden of demonstrating that, absent the tortious conduct of the defendants, the decedent ultimately would have lived. Instead, the plaintiff argues, she bore a lesser burden of demonstrating "that the breach of the duty [to respond] by [the] defendants result[ed] in 'physical harm' [to the decedent]." Then, the plaintiff argues that, by means of the testimony of Zagieboylo and Wilson, she satisfied this causal element because their testimony "proved that [the decedent] suffered physical harm when she collapsed from a GI bleed . . . ."

The plaintiff refined her argument in her reply briefs. There, she argues that, under § 323 of the Restatement (Second), she demonstrated that the breach of VNA's "affirmative contractual duty" to send assistance to the decedent's residence (1) increased the risk of harm to the decedent *and* (2) the decedent suffered harm because of her *reliance* on VNA to perform its contractual duty. Additionally, in her reply brief, she argues that, under § 323, she did not need to demonstrate that VNA's tortious conduct was the cause in fact of the decedent's death, but only that the decedent suffered a type of harm that VNA "knew or should have anticipated . . . was likely to result from its failure to act." In a similar fashion, the plaintiff argues with respect to Lifeline that its "failure to undertake its contractual and voluntary duty to send assistance in all the ways it had represented it would" (1) increased the risk of harm to the decedent *and* (2) caused the decedent "[to suffer] harm because she relied upon Lifeline to perform this duty."

At the time of oral argument before this court, the plaintiff further refined her argument with respect to § 323 of the Restatement (Second). The plaintiff argued that a proper analysis of cause should focus on whether there was an affirmative duty undertaken by the defendants, whether the decedent relied on the performance of that duty, and whether this increased the decedent's risk of harm. The plaintiff argued that it was sufficient for her to demonstrate that the type of harm suffered by the decedent was within the "general nature" of

the harm that foreseeably could have resulted from a breach of the affirmative duties undertaken by the defendants, but that she did not have to demonstrate that the specific harm suffered by the decedent was actually caused by the defendants.

The trial court did not expressly consider the plaintiff's causes of action under this theory of liability. Nonetheless, the plaintiff argues that this theory was properly before the court because, from the inception of this case, she relied on it. VNA and Lifeline contest the plaintiff's characterization of her causes of action and argue that the plaintiff relies on § 323 of the Restatement (Second) for the first time before this court in an attempt to overturn the trial court's ruling on a basis that was not argued before nor decided by the court. It is well settled that this court generally does not review claims not raised before the trial court. See, e.g., *Bragdon* v. *Sweet*, 102 Conn. App. 600, 607, 925 A.2d 1226 (2007). Alternatively, the defendants argue that the plaintiff cannot prevail under § 323.

The record belies the fact that the plaintiff clearly relied on § 323 of the Restatement (Second) throughout the course of the trial. In fact, as set forth previously, the plaintiff's interpretation of her burden of proof seems to have continued to evolve between the time that she filed her principal appellate brief, the time that she filed her reply briefs, and the time of oral argument before this court. Even if we conclude that the plaintiff's causes of action should be evaluated in terms of the theory of liability set forth in § 323, in the manner advanced by the plaintiff, we would not conclude that the court's ruling was improper. First, we observe that the plaintiff urges us to interpret § 323 such that it does not require her to prove that the defendants' conduct resulted in the injuries for which she seeks compensation, but merely that the defendants undertook an obligation to render services to protect the decedent's person, their failure to render such services increased the risk of harm to the decedent, and the decedent suffered a type of foreseeable harm. In focusing on the risk of harm caused by the defendants and the decedent's reliance on the services undertaken by the defendants, however, the plaintiff fails to afford due consideration to the earlier language in § 323 that gives rise to liability "*for physical harm resulting from*" one's failure to exercise reasonable care in rendering such services to another. (Emphasis added.) 2 Restatement (Second), supra, § 323; see footnote 9 of this opinion. This language in § 323 does not support the plaintiff's argument that she did not bear the burden of proving that the conduct at issue was the cause in fact of the injuries for which compensation was sought.

Second, we address the plaintiff's argument that, rather than proving that the defendants were the cause in fact of the decedent's death, it was sufficient for

her to have proven that VNA and Lifeline caused the decedent to suffer a type of physical harm[8] that was foreseeable to them when they contractually agreed to provide the services at issue to the decedent. Assuming, arguendo, that this is a correct statement of the plaintiff's burden of proof, the plaintiff's argument fails because it is based on a flawed assessment of the evidence presented. As we will explain in detail later in our analysis of this claim, the plaintiff not only failed to demonstrate that the defendants were the cause in fact of the decedent's death, but she failed to demonstrate that the alleged tortious conduct was the cause in fact of any physical harm suffered by the decedent.

Having addressed the plaintiff's arguments with respect to the proper burden of proof, we turn to an examination of the relevant evidence. We observe that Zagieboylo testified that the decedent was one of his patients beginning in 2007. The decedent suffered from a variety of physical conditions, including anemia, gastritis, hypertension, and vertigo. The decedent suffered a mild stroke in 2010 and walked with a cane because she experienced issues with balance. Zagieboylo testified that he had evaluated the decedent on November 16, 2010, and that the general state of her health at that time was stable.

Zagieboylo testified that he reviewed a report prepared by Wilson as well as her deposition testimony in this case. He stated that he was aware that, at the time that Wilson responded to the decedent's residence, she observed what she believed to be dark, tarry stool in the decedent's toilet, and that such stool signified an upper GI bleed, which may cause dizziness and lightheadedness. Also, he testified that GI bleeds may precipitate other medical conditions such as collapsing, fainting, heart attack, or stroke. Zagieboylo testified that, on the basis of Wilson's observations, he believed with a reasonable degree of medical probability that the decedent suffered from a GI bleed. Zagieboylo testified that patients with GI bleeds are treated by being given fluids and blood intravenously. He opined that the amount of fluid that is administered to patients suffering a GI bleed acutely determines the success rate that medical treatment will prevent death. Also, Zagieboylo testified with a reasonable degree of medical certainty that the decedent would not have died instantaneously from a GI bleed alone.[9]

The plaintiff also relies on the testimony of Wilson.[10] Initially, we observe that Wilson did not opine with respect to the cause of the decedent's death.[11] Relevant to the issue before us, Wilson's testimony demonstrated that she responded to the decedent's residence on July 29, 2011, after Timmer gained entrance to the residence. She observed the decedent on the floor near the bathroom, determined that life-saving measures would be futile, and observed black, tarry stool in the toilet. Wil-

son testified: "If the patient had that amount of dark tarry stool that would lead me to believe that she had a problem with a GI bleed."

To demonstrate that the defendants' alleged tortious conduct caused the damages for which compensation was sought, it was essential that the plaintiff prove what caused the decedent's death.[12] For, if the jury was left without evidence of the cause and timing of the decedent's death, it simply could not reasonably make a finding that the alleged tortious conduct of the defendants actually caused her death or any amount of suffering prior to her death. There was no autopsy performed on the decedent's body. The plaintiff attempted to demonstrate through the testimony of both Zagieboylo and Wilson that (1) the plaintiff died as a result of a GI bleed, (2) she immediately summoned help after using the bathroom, (3) the decedent would have survived until help arrived, and (4) that a timely emergency response likely would have saved the decedent's life. The evidence presented, however, did not provide necessary clarification with respect to the cause of death and, thus, left unanswered the questions of whether it was likely that the decedent would have survived for any length of time after summoning emergency help, whether it was likely that she would have survived until emergency help arrived, and whether it was likely that a timely emergency response would have saved her life. The jury could have answered such questions in the plaintiff's favor only by resort to conjecture and speculation, which, of course, is forbidden. See, e.g., *Curran* v. *Kroll*, supra, 303 Conn. 855–56; *Boehm* v. *Kish*, 201 Conn. 385, 389, 517 A.2d 624 (1986).

As Zagieboylo made clear to the trial court, the decedent's unwitnessed death could have been the result of one or more causes. Although it was undisputed that the decedent perished, the plaintiff did not establish a sequence of events causally flowing from the defendants' negligence to her death. See, e.g., *Wu* v. *Fairfield*, 204 Conn. 435, 440, 528 A.2d 364 (1987) (evidence of causation lacking when "[t]he plaintiff failed to establish an unbroken sequence of events causally flowing from [defendant's alleged negligent acts] to the decedent's drowning"); *Grody* v. *Tulin*, 170 Conn. 443, 451, 356 A.2d 1076 (1976) (evidence of causation lacking when jury left to speculate "as to whether an earlier diagnosis and treatment [which may have been beneficial] . . . might have prolonged [decedent's] life"). Assuming that the plaintiff presented evidence that the decedent utilized the Lifeline device in an attempt to obtain emergency help and that she perished while waiting for a response, the evidence at most supported an inference that the decedent died while waiting for a response, not that her death was caused by the lack of such response.

Similarly, assuming that the plaintiff presented evi-

dence that the decedent utilized the Lifeline device in an attempt to obtain emergency help, we conclude that an evidentiary void existed with respect to whether, after doing so, she would have endured any less suffering if the Lifeline system had performed satisfactorily. The plaintiff did not present sufficient evidence to demonstrate what caused the decedent's death and likewise failed to shed light on whether she remained alive, and for how long, after attempting to summon help; whether and for how long she was able to experience suffering; or whether she had any awareness that a medical emergency existed. The jury was left to speculate whether the decedent had collapsed and, thereafter, remained conscious for a significant amount of time or whether the decedent had experienced a fatal health condition that caused death prior to the time at which emergency assistance would have arrived if the Lifeline system had performed satisfactorily.[13]

The plaintiff hypothesizes that the decedent died a slow and agonizing death after she attempted to obtain emergency help by means of her Lifeline device. The defendants hypothesize that, even if emergency help arrived in a timely manner, the decedent would not have survived or been spared suffering. It was necessary for the plaintiff to present "some basis of definite facts" to enable the jury reasonably to infer what transpired to actually cause the decedent's death, or that one view of the evidence was more reasonable than the other. *Paige* v. *Saint Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 33, 734 A.2d 85 (1999). We are mindful that the plaintiff did not bear the burden of proving her case beyond a reasonable doubt, but merely by a preponderance of the evidence. Nor did the plaintiff bear the burden of presenting evidence that was so conclusive that it necessarily disproved every other hypothesis fairly drawn from the facts in evidence. The plaintiff's evidence was insufficient because the critical inferences on which she relied were not reasonably drawn from the evidence, but could only be reached by engaging in speculation or conjecture. "The decisive consideration is not whether the finding implicit in the jury's verdict is consistent or inconsistent with another or other hypotheses but whether or not the inference upon which it is based was one which could have been fairly and reasonably drawn from the physical facts without the admixture of speculation or conjecture." *LeBlanc* v. *Grillo*, 129 Conn. 378, 382, 28 A.2d 127 (1942).

In exercising our plenary review, and having considered the facts in the light most favorable to the plaintiff, we conclude that the court properly granted the defendants' motions for a directed verdict.

## II

Next, the plaintiff claims that the court erroneously excluded three matters from evidence. The first is a

report generated by Fox, an engineer. According to the plaintiff, the report contained Fox's observations with respect to the Lifeline system connected to the decedent's telephone, as well as "defects in the device he directly observed and his opinions on causation, all of which had been directly derived from his review of, analysis, and testing of [the decedents] actual Uniden phone, Lifeline device, and the splitter." The second was "evidence pertaining to [the decedent's] lost income claims of Social Security and pension . . . ." The third matter that the plaintiff raises as a claim of evidentiary error is as follows: "The court . . . precluded all probate administration costs from the damage claim, with the exception of funeral and burial expenses . . . ."

In part I of this opinion, we concluded that, on the basis of the evidence presented with respect to the essential element of causation, the plaintiff failed to establish a prima facie case. Accordingly, we concluded that the court properly granted the defendants' motions for a directed verdict. No aspect of the plaintiff's second claim impacts our analysis of the claim addressed in part I of this opinion. Because the claim addressed in part I is dispositive of this appeal, we need not and do not reach the merits of the second claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff also named Philips Healthcare Informatics, Inc., and Koninklijke Philips Electronics NV, as defendants. Later, during the course of the trial, the plaintiff withdrew claims against these parties, and they are not parties to the present appeal. We refer to Lifeline and VNA individually by name where necessary, and collectively as the defendants.

[2] In her brief, the plaintiff raises two separate claims with respect to the causation issue. We address these claims together.

[3] Although, in her brief, the plaintiff states that the court failed to comply with her request for a signed memorandum of decision; see Practice Book § 64-1; the court file includes a signed transcript that encompasses the trial court's decision.

[4] Relying on a sentence in the court's oral decision, the plaintiff suggests that the court rendered judgment for one, but not both, of the defendants. This suggestion contradicts the plaintiff's appeal form, on which she described the judgment from which she appeals in relevant part as "Orders Granting *Defendants' Motions* for Directed Verdict." (Emphasis added.) After the court orally stated its decision, the court issued a written order that rectified any ambiguity in this regard; its order stated in relevant part: "Motions for directed verdict filed by the defendants are hereby granted. Judgment is entered in favor of the defendants pursuant to this court's decision, entered on the record on March 24, 2015." This ruling in favor of both defendants is reflected in the court's judgment file.

[5] In this appeal, the plaintiff's statement of claims does not refer to the breach of contract cause of action brought against VNA. In the plaintiff's analysis of the issue of proximate cause, the plaintiff's brief contains an isolated reference "to the claims against the defendant VNA," but does not contain an analysis of the court's ruling as it relates to the breach of contract cause of action.

Even if we were to conclude that the plaintiff's proximate cause arguments were broad enough to encompass both causes of actions brought by the plaintiff against VNA and, thus, sufficiently challenged the court's ruling as it related to the directed verdict rendered with respect to the breach of contract cause of action, we would reject the claim on its merits. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Sullivan* v. *Thorndike*, 104

Conn. App. 297, 303, 934 A.2d 827 (2007), cert. denied, 285 Conn. 907, 908, 942 A.2d 415, 416 (2008). In a breach of contract action, "[t]he causation requirement focuses on whether a loss may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself. . . . [U]nder Connecticut law, the causation standard applicable to breach of contract actions asks not whether a defendant's conduct was a proximate cause of the plaintiff's injuries, but rather whether those injuries were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct." (Citations omitted; internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 187–89, 90 A.3d 219 (2014). "[T]he nonbreaching party may recover only for damages that are direct[ly] and proximate[ly] caused by a defendant's breach of contract, causation is an element—and a crucial one—of the plaintiff's prima facie case." (Internal quotation marks omitted.) *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 504, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006). Thus, consistent with the other causes of action set forth in her complaint, in the breach of contract count, the plaintiff bore the burden of proving that VNA's conduct was a cause in fact of the injuries for which compensation was sought, all of which were inherently related to the decedent's death. Our analysis in this claim, therefore, applies to the court's ruling with respect to the breach of contract cause of action as well.

[6] The plaintiff asserts that the jurors could have resolved the issue of causation in the present case, without the guidance of expert testimony, by bringing to bear their everyday experiences in life. She argues: "A complex medical opinion was not required for causation in this case because it was for the jury to decide based upon common everyday experience whether [the decedent] remaining on the floor was a substantial factor in causing her any injury, up to and including death. The trial court's emphasis in its decision on time and cause of death was misplaced because the jury would have only needed evidence about how long it took [for the decedent] to die in order to decide the issue of damages because . . . the issue of a lingering death would allow jurors to reach back to the antecedent harmful results of [the decedent] waiting for an ambulance that never came . . . ." (Emphasis omitted; internal quotation marks omitted.) The plaintiff's argument in this regard appears to focus on the issue of foreseeability, not cause in fact. To the extent that her argument applies to the issue of cause in fact, it suffices to observe that, even if we were to agree with the plaintiff's argument that the types of cause in fact issues raised by her complaint were within the everyday life experience of the average juror, she nonetheless failed to demonstrate, absent expert opinion, why the decedent collapsed or died; the time that elapsed, if any, between when she collapsed and her death; and, thus, whether, while still alive, she endured any amount of time waiting for emergency help to respond.

[7] Section 323 of the Restatement (Second) of Torts provides: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."

[8] As stated previously, the plaintiff expressly argues that the defendants caused physical harm in that the decedent suffered a GI bleed and collapsed. This argument is puzzling in light of the plaintiff's arguments generally that focused on the decedent's alleged physical and mental suffering following her collapse. In construing the evidence, as a whole, in the light most favorable to the plaintiff, we have considered the plaintiff's claim in terms of any type of physical harm demonstrated by the evidence.

[9] During examination outside of the presence of the jury, Zagieboylo repeatedly expressed his inability to opine with respect to the actual cause of the decedent's death. Zagieboylo opined that the GI bleed contributed to the decedent's death, but also opined that any attempt by him to testify with respect to the actual cause of death would be "speculative." The court, in explaining the weaknesses in the plaintiff's case-in-chief, highlighted some of this testimony in its decision. In part, Zagieboylo testified that possible causes of death included cerebral vascular disease, stroke, and coronary artery disease. Zagieboylo stated that he did not know how long the decedent was lying on the ground prior to her death. Also, he testified that he was unable to opine that the decedent had experienced lightheadedness or dizziness, or that the decedent had collapsed because of such symptoms. Zagie-

boylo testified that he was not able to testify that it was more likely than not that, had the decedent activated the Lifeline system prior to falling, and emergency care had arrived within ten minutes, she would have lived.

[10] In discussing the evidence presented with respect to causation, the plaintiff refers to testimony from Randolph, an engineer. She refers to Randolph's opinion with respect to defects in the Lifeline system, not the timing of or cause of the decedent's death. Randolph's testimony is not relevant to the present analysis.

[11] Wilson, an advanced EMT, lacked the requisite education or training to have rendered an admissible opinion with respect to the decedent's cause of death or how long she may have remained alive following the symptoms that may have preceded her death. We observe that, during examination outside of the presence of the jury, Wilson testified with respect to her belief that issues concerning the cause or timing of the decedent's death were outside of her field of expertise.

[12] It suffices to observe that many of the plaintiff's arguments before this court focus on the foreseeability of the decedent's death, not its cause in fact. The plaintiff heavily relies on a trial level decision, *Aherne* v. *Lifeline Systems*, *Inc.*, Superior Court, judicial district of New Haven, Docket No. CV-99-0269317-S (March 21, 2003), a case in which the cause in fact of the plaintiff's injuries did not appear to be in dispute. *Aherne* is materially distinguishable from the present case and, to the extent that the plaintiff relies on *Aherne* for the proposition that the court's causation analysis in the present case should have focused on the foreseeability of the plaintiff's damages rather than their cause in fact, for the reasons we already have discussed in this opinion, such an interpretation is legally flawed.

[13] There was, in fact, some evidence to suggest that the decedent suffered an immediate death and did not, as the plaintiff alleged, consciously suffer on the floor of her residence while waiting for help to arrive. Wilson testified that the decedent's body was discovered face down on the floor. The decedent's head was not tipped to one side, her nose had been pushed into her head by the weight of her body, and her arms were positioned completely under her torso. Wilson testified that "it's just instinct to break your fall and . . . put your arms out and protect your face and your head if you're going to fall, if you know you're going to fall . . . you . . . grab on to something or brace yourself or turn your head, and she was like this on the floor." Thus, Wilson testified that the position of the decedent's body suggested that it did not appear to her that the decedent consciously took any defensive action when she fell to the ground.